UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THOMAS JAY JOHNSON,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No.17-cv-05994-VKD<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 22, 23 |

Plaintiff Thomas Jay Johnson appeals a final decision by defendant Commissioner of

Social Security ("Commissioner") denying his application for supplemental security income

("SSI") under Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381, *et seq*. The parties

have filed cross-motions for summary judgment. Pursuant to the Court's order (Dkt. No. 16), each

side also submitted statements of the administrative record. Dkt. Nos. 22-1, 23-1, 25. The

matter was submitted without oral argument. Upon consideration of the moving and responding

papers, the relevant evidence of record, and for the reasons set forth below, Mr. Johnson's motion

for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for

summary judgment is granted in part and denied in part, and this matter is remanded for further

proceedings consistent with this order.[1]

## I.     STANDARD FOR DETERMINING DISABILITY

### A.     The Five-Step Analysis

A claimant is considered disabled under the Act if he meets two requirements. First, a

---

[1] All parties have expressly consented that all proceedings in this matter may be heard and finally
adjudicated by a magistrate judge. 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 9, 15.

claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). Second, the impairment must be so severe that a claimant is unable to do previous work, and cannot "engage in any other kind of substantial gainful work which exists in the national economy," considering the claimant's age, education, and work experience. *Id.* § 423(d)(2)(A).

In determining whether a claimant has a disability within the meaning of the Act, an Administrative Law Judge ("ALJ") follows a five-step sequential analysis:

At step one, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). If so, the claimant is not disabled. If not, the analysis proceeds to step two.

At step two, the ALJ assesses the medical severity of the claimant's impairments. 20 C.F.R. § 416.920(a)(4)(ii). An impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id*. § 416.920(c). If the claimant has a severe medically determinable physical or mental impairment, or a combination of impairments, that is expected to last at least 12 continuous months, *id.* § 416.920(d), he is disabled. *Id*. § 416.920(a)(4)(ii). Otherwise, the evaluation proceeds to step three.

At step three, the ALJ determines whether the claimant's impairments or combination of impairments meets or medically equals the requirements of the Commissioner's Listing of Impairments. *Id.* § 416.920(a)(4)(iii). If so, a conclusive presumption of disability applies. If not, the analysis proceeds to step four.

At step four, the ALJ determines whether the claimant has the residual functional capacity ("RFC") to perform his past work despite his limitations. *Id.* § 416.920(a)(4)(iv). If the claimant can still perform past work, then he is not disabled. If the claimant cannot perform his past work, then the evaluation proceeds to step five.

At the fifth and final step, the ALJ must determine whether the claimant can make an adjustment to other work, considering the claimant's RFC, age, education, and work experience.

*Id.* § 416.920(a)(4)(v). If so, the claimant is not disabled.

The claimant bears the burden of proof at steps one through four. The Commissioner has the burden at step five. *Bustamante v. Massanari*, 262 F.3d 949, 953–54 (9th Cir. 2001).

## B.    Supplemental Regulations for Determining Mental Disability

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration ("SSA") has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment, establishing a "special technique at each level in the administrative review process." 20 C.F.R. § 416.920a(a) (2016). First, the ALJ evaluates the claimant's "symptoms, signs, and laboratory findings" to determine whether the claimant has a "medically determinable mental impairment." *Id.* § 416.920a(b)(1) (2016). For each of the categories contained in the adult mental disorder listing, these specific symptoms, signs, and laboratory findings are described in Paragraph A. 20 C.F.R. pt. 404, Subpt. P., App. 1, § 12.00 (2016).

If the claimant has a "medically determinable mental impairment," the ALJ assesses the degree of the claimant's functional limitation in the four "broad functional areas" identified in "paragraph B" and "paragraph C" of the adult mental disorders listings. *See* 20 C.F.R. § 416.920a(c)(3) (2016); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *4 (July 2, 1996).[2] At the time of the ALJ's decision, those four functional areas were: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 416.920a(c)(3) (2016). Limitations are rated on a "five-point scale: None, mild, moderate, marked, and extreme." *Id.* § 416.920a(c)(4) (2016). When discussing the fourth functional area (episodes of decompensation), the limitation is rated on a "four-point scale: None, one or two, three, four or more." *Id.* § 416.920a(c)(4) (2016). Based on these limitations, the ALJ determines whether the claimant has a severe mental impairment and whether it meets or equals a listed impairment. *See id.* § 416.920(d)(1)-(2) (2016). This evaluation process is to be used at the

---

[2] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." *Holohan v. Massanari*, 246 F.3d 1195, 1202 n.1 (9th Cir. 2001) (citations omitted).

1  second and third steps of the sequential evaluation discussed above.  SSR 96-8p, 1996 WL

2  374184, at *4 ("The adjudicator must remember that the limitations identified in the 'paragraph B'

3  and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental

4  impairment(s) at steps 2 and 3 of the sequential evaluation process.").

5          If the ALJ determines that the claimant has a severe mental impairment that neither meets

6  nor is equal to any listing, the ALJ must assess the claimant's residual functional capacity.  20

7  C.F.R. § 416.920(d)(3) (2016).  This is a "mental RFC assessment [that is] used at steps 4 and 5 of

8  the sequential process [and] requires a more detailed assessment by itemizing various functions

9  contained in the board categories found in paragraphs B and C of the adult mental disorders

10  listings in 12.00 of the Listing of Impairments . . . ."  SSR 96-8p, 1996 WL 374184, at *4.

11  **II.      BACKGROUND**

12          Mr. Johnson was born in 1965[3] and was 51 years old at the time the ALJ rendered the

13  decision under consideration here.  AR[4] 36.  He has a 10th grade education and did not graduate

14  from high school.  AR 77–78.  He previously worked as an airport sky cap from 1990 to 2007.

15  AR 42, 47, 189–91, 323–23.  He had also worked at McDonalds, as a bar helper, and as a welder

16  for periods less than a year.  AR 357.  He last attempted to work in 2008 as a transport driver, but

17  he held that position only a few weeks due to personal conflicts with coworkers.  AR 59, 61.  Mr.

18  Johnson has been mostly homeless since approximately 1996.  He currently receives general

19  assistance and limited financial assistance from a family member.  AR 43–45, 53, 324, 356; *see*

20  *also* AR 362.

21          The record is not entirely clear, but indicates that Mr. Johnson may have begun

22  experiencing symptoms of schizophrenia, paranoia, and depression as early as 1996, which

---

[3] The ALJ's opinion and other SSA documents state that Mr. Johnson was born in 1964.  *See, e.g.*, AR 27, 82, 99, 249.  However, Mr. Johnson's driver's license and medical records indicate that he was born in 1965.  AR 312, 315, 321–56, 362.  Moreover, medical records and the hearing transcript refer to Mr. Johnson as being 51 years old in May 2016.  AR 36, 79, 363; *see also* AR 49 (discussing amendment of onset date to 2015 because Mr. Johnson fell 50 on that date).  The ALJ also noted that Mr. Johnson was 50 years old when he applied for SSI on June 20, 2014.  AR 27, 28.

[4] "AR" refers to the certified administrative record lodged with the Court.  Dkt. No. 21.

worsened after his parents passed away in 2002 and 2006.  AR 42, 317, 323.  He did not seek

mental health treatment until October 2015.  AR 321–28.

Mr. Johnson applied for SSI on June 20, 2014, alleging only that he was unable to work as

of August 1, 2010 due to back and neck conditions, high blood pressure, and bleeding

hemorrhoids.  AR 176–86, 200.  He later amended his alleged onset date to January 19, 2015.  AR

277.  Although his initial application did not list mental impairments, those mental impairments

later became the focus of his claim for disability.  AR 37; *see also* AR 277–84.

### A.      Summary of Relevant Medical Evidence

The record includes medical evidence from Mr. Johnson's treating physicians, nurse

practitioners, and a psychology student supervised by examining physicians.  The medical

evidence spans the period of time from September 2015 to March 2016.

#### 1.      Treating Physician Iris Chuang, MD

Dr. Chuang met with Mr. Johnson four times between October 2015 and March 2016.

##### a.      October 2, 2015 visit

At his first visit on October 2, 2015, Dr. Chuang noted that Mr. Johnson had no prior

psychiatric history or treatment, but had been suffering from depression since the "mid 90s."  AR

323.  Dr. Chuang[5] observed that Mr. Johnson was "alert and oriented to person, place, and

situation," his grooming and hygiene were within normal limits, he exhibited good eye contact,

and was cooperative with the interview.  AR at 325.  Mr. Johnson exhibited no unusual

movements, but reported auditory hallucinations and paranoia/delusions.  *Id.*  Mr. Johnson's mood

and affect were in abnormal limits and dysphoric, but his judgment and insight appeared fair.  *Id.*

Mr. Johnson stated that he was unable to work because he could not follow directions or

understand them, had difficulty functioning at work, and could not get along with people.  *Id.*  Mr.

Johnson also stated that he could not tolerate other people and avoided them because he was easily

offended by them and thought they were "out to get him."  *Id.* (stating also that he "cannot deal

---

[5] Dr. Chuang's progress notes include a psychosocial assessment that was "Reviewed Per SW A. Medellin."  AR 324.  It is not entirely clear who conducted the psychosocial assessment, but this same assessment appears to be repeated verbatim in Dr. Chuang's later progress notes as well.  AR 330–31, 335–36, 343–44.

with being around a lot of people," that he felt "inferior, helpless, and depressed when he is around big crowds," and that he "often feels like other people are against him"). He admitted to hearing "funny noises" but was "unable or will not elaborate." AR 323; *see also* AR 325 (noting that Mr. Johnson "hears voices that call his name and often hears noises such as music"). Although he was "[v]ery irritable and preserverative," Dr. Chuang noted that Mr. Johnson was "[q]uite concrete in responses." AR 323. However, she also observed that Mr. Johnson claimed that he got along with his mother, but then said she would not allow him to stay with her when she was alive. When Dr. Chuang pointed out that inconsistency, Mr. Johnson seemed "startled and quite puzzled." *Id.* She noted that Mr. Johnson was a "[p]oor historian overall." *Id.* Mr. Johnson agreed to a trial of Risperdal to help with his depression and sleeping problems. *Id.*; *see also* AR 325 (noting Mr. Johnson's reports of depressive dreams related to his childhood and marriage).

### b. December 4, 2015 visit

Dr. Chuang saw Mr. Johnson on December 4, 2015 for a follow-up examination. AR 329–31. Mr. Johnson indicated that he had been taking Risperdal and Paxil, but he did not believe the Risperdal was working, as he still experienced auditory hallucinations that were "the same," although his sleep had improved. AR 330. Mr. Johnson asked to try a different medication instead of Risperdal, and agreed to try Haldol. *Id.* Dr. Chuang noted that he was "[n]ot as irritable as initial presentation" and that he was "more calm." *Id.* She also noted, "Interested in therapy groups then individual therapy." *Id.*

### c. January 5, 2016 visit

Dr. Chuang examined Mr. Johnson on January 5, 2016. AR 332–36. Although Mr. Johnson indicated that he continued taking his medications, he was "still depressed." AR 332. He stated that Haldol was better for him than Risperdal, which made him dizzy, but that he only felt 30% improved. *Id.* He declined any change in medication, "find[ing] that he can deal and manage with life a little better since being on Haldol." *Id.* Dr. Chuang noted that Mr. Johnson was not as irritable and disgruntled as when he first presented to the clinic pre-medication. *Id.* Mr. Johnson indicated his willingness to increase his Haldol dosage for further improvement in thought process and daily functioning, although he declined to take a morning dose "as sedating." *Id.* Dr.

Chuang's notes also stated, "Therapy–not interested." AR 334.

### d. March 29, 2016 visit

Mr. Johnson's last recorded visit with Dr. Chuang took place on March 29, 2016. AR 342–44. He sought a refill for his prescriptions, stating that he still experienced auditory hallucinations, but that he was "more relaxed." AR 342. He still avoided people and admitted to "easy paranoia." *Id.* Dr. Chuang noted that he was "[s]omewhat less depressed with Paxil increase also, wants to stay on same doses." *Id.* Mr. Johnson told Dr. Chuang that he had not been sleeping well and was kicked out of the gym for dozing off, and inquired about the possibility of getting a doctor's note. *Id.* Dr. Chuang explained to him that a doctor's note likely would not help in his situation. *Id.* Dr. Chuang's notes again stated, "Therapy–not interested." *Id.* She refilled Mr. Johnson's prescriptions. AR 344.

### 2. Treating Physician Viet Le, MD

Dr. Le is Mr. Johnson's treating psychiatrist who saw him at least four times between October 2015 and March 2016.

### a. October 19, 2015 visit

On Mr. Johnson's first visit on October 19, 2015, Dr. Le noted a history of schizophrenia, chronic paranoid type; obsessive-compulsive disorder; and borderline intellectual functioning. AR 328. At this point, Mr. Johnson had been taking Rispderal for a little more than two weeks, but did not report any benefits yet. *Id.* Mr. Johnson "continued to endorse paranoia (the people at EHC looking at him and not wanting him to eat)" as well as "OCD symptoms of excessive checking and feeling stuck when he checked and became lost in the process." *Id.* Dr. Le noted that Mr. Johnson was "quite preserverative" and repeated statements over and over. *Id.* Mr. Johnson was anxious and averted eye contact. *Id.* His hygiene and grooming were "fair," his mood anxious and depressed, and his affect tense and dysphoric. *Id.* He reported auditory hallucinations at night and sometimes during the day. *Id.*

### b. October 29, 2015 visit

Dr. Le saw Mr. Johnson for a medication evaluation on October 29, 2015. AR 329. Mr. Johnson reported sleeping better, but Dr. Le noted that he "continued to show moderate-to-severe

paranoia and OCD symptoms," repeating statements over and over for reassurance. *Id.* Dr. Le advised Mr. Johnson to continue taking his medications and to expect benefits within two to three weeks. *Id.* Mr. Johnson's hygiene and grooming were "marginal," his mood anxious and depressed, his affect tense and dysphoric. *Id.* Dr. Le noted "mild early improvement" but that Mr. Johnson was "still symptomatic." *Id.* Dr. Le planned to continue the Risperdal and Paxil treatment. *Id.* He also wrote, "Group psychology" in his notes. *Id.*

### c. November 6, 2015 visit

Mr. Johnson returned to see Dr. Le on November 6, 2015. AR 329. He "continu[ed] to feel better on the meds" and "appeared to be more engaged, now that the meds have started to be effective for him." *Id.* Mr. Johnson discussed "being threated and attacked by others in the past" and asked Dr. Le for advice on how to react. *Id.* Dr. Le also "[d]iscussed psychology group attending here with patient for eventual 1:1 work." *Id.* Mr. Johnson's hygiene and grooming were again "marginal," but he was calm and cooperative. *Id.* He remained preserverative and repetitive "but less than before." *Id.* His mood was mildly anxious and depressed, and his affect mildly tense and dysphoric. *Id.* Dr. Le planned to continue the Risperdal and Paxil treatment and again noted, "Group psychology." *Id.*

### d. December 23, 2015 Mental Impairment Questionnaire

Dr. Le completed a Mental Impairment Questionnaire (RFC & Listings) ("MIQ") on December 23, 2015. AR 315–20. The MIQ stated that Mr. Johnson suffered from, among other things, paranoid schizophrenia, OCD, and borderline intellectual functioning, and that his current Global Assessment of Function ("GAF")[6] score was 45. *Id.* at 315. According Dr. Le, Mr. Johnson had "been compliant with taking meds and clinic follow up, with partial response to medications." *Id.* Mr. Johnson experienced side effects of sedation and fatigue. *Id.* Dr. Le

---

[6] "A GAF score is a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." *Vargas v. Lambert*, 159 F.3d 1161, 1164 n.2 (9th Cir.1998). "Although GAF scores, standing alone, do not control determinations of whether a person's mental impairments rise to the level of a disability (or interact with physical impairments to create a disability), they may be a useful measurement." *Garrison v. Colvin*, 759 F.3d 995, 1002 n.4 (9th Cir. 2014). According to the DSM–IV, a GAF score between 41 and 50 describes "serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.*

further described his clinical findings that "symptoms reduced with meds, but Mr. Johnson has continued to have moderate residual auditory hallucination and paranoia." *Id.* The MIQ listed the following identified signs and symptoms: thoughts of suicide; blunt, flat or inappropriate affect; mood disturbance; difficulty thinking or concentrating; persistent disturbances of mood or affect; paranoid thinking or inappropriate suspiciousness; recurrent obsessions or compulsion which are a source of marked distress; emotional withdrawal or isolation; hallucinations or delusions; vigilance and scanning; and sleep disturbance. AR 316.

Dr. Le concluded that Mr. Johnson was "unable to meet competitive standards" for all listed mental abilities and aptitudes needed to do unskilled work with the exception of using public transportation. AR 317–18. In support of that conclusion, Dr. Le explained:

> Mr. Johnson has h/o [history of] chronic paranoid schizophrenia, untreated, until he came to our clinic on 10/01/15. The medications have started to decrease his paranoia and enable him to come to clinic regularly for assessment. Yet, he is still very grossly impaired from years of untreated symptoms and chronic homelessness (since 1996). He has remained very paranoid in unfamiliar and crowded situation[s].

AR 317. Dr. Le also noted that "Mr. Johnson usually presented to clinic in marginal hygiene and grooming. He was usually very paranoid and vigilant." AR 318.

With respect to Mr. Johnson functional limitations, Dr. Le found that he had moderate restrictions in activities of daily living, marked restrictions in maintaining social functioning and concentration, persistence or pace, and that he had three episodes of decompensation within 12 months, each of at least two weeks duration. AR 319. He also concluded that Mr. Johnson suffered from a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would likely cause him to decompensate. *Id.* Dr. Le further concluded that Mr. Johnson's mental impairments would cause him to be absent from work more than four days per month. *Id.*

### e. February 19, 2016 visit

Dr. Le saw Mr. Johnson again on February 19, 2016. AR 336. Mr. Johnson noted that the medications had been "helpful," and although he still experienced auditory hallucinations, "the

intensity has decreased from 10 → 7 with recent Haldol dose increase." *Id.* Mr. Johnson did not want to change his medications at this time, although he agreed to increase his Paxil dosage. He "also appeared less stuck, though admitting to still feeling depressed." *Id.* Mr. Johnson's hygiene and grooming were again marginal, and he was "malodorous." *Id.* Dr. Le noted that he was less preserverative than previously, his mood was mildly anxious and depressed, and his affect was mildly tense and dysphoric. *Id.* Dr. Le observed that Mr. Johnson "continued to improve but still mildly impaired." *Id.*

### 3. Treating Nurse Practitioner Mercy Egbujor, DNP

In September 2015, Mr. Johnson began receiving care at the Santa Clara Valley Medical Center with Nurse Practitioner Mercy Egbujor, DNP. AR 321–23. The main purpose of his first visit was for evaluation for Santa Clara County's general assistance program, as Mr. Johnson asserted he could not work because of his back pain and mental health issues. AR 321. He reported symptoms of anxiety, depression, hallucinations, memory difficulty, and sleep disturbances. AR 322. With respect to his schizoaffective disorder, depressive type, Ms. Egbujor noted:

> Hears voices; some voices are good and others are mean. No SA [substance abuse] history, has some thought of hurting self but not at this time. No prior mental health hospitalization. Positive FHMX [family medical history] mental illness; his younger sister suffered from mental illness. Gets depressed; has never taken medication for mental health. Has not worked since 2007. Lost his bearing after the loss of both his parents in 2002 and 2006.

AR 322–23. With respect to his paranoid disorder, Ms. Egbujor noted, "Has difficulty trusting; has to 'think about it' whether to get ordered tests and exams done. Admits that he feels that people are after him." AR 323.

Ms. Egbujor completed a "General Assistance Program – Request for Medical Information" form on September 22, 2015. AR 362. On that form, she checked the boxes for "physical" disability and "learning disabled," but not for "psychological" disability. She wrote that "depression, psychosis with paranoid tendencies, hear voices, low literacy, unable to read/write well" contributed to Mr. Johnson's disability. *Id.* She asserted that the disability was

expected to last more than 12 months, that Mr. Johnson did not experience significant restriction of activities of daily living, but that there were significant deficiencies of concentration, persistence or pace. *Id.* She noted that Mr. Johnson was capable of only low stress jobs, that in her opinion, he was permanently disabled and unable to work, and that she supported an SSI disability claim. *Id.* When asked to indicate the objective evidence of the limitations she noted, Ms. Egbujor wrote "patient history." *Id.*

### 4. Treating Nurse Practitioner Sondramae Couser, NP

Ms. Couser examined Mr. Johnson on March 29, 2016 for his hemorrhoids. AR 344–47. She noted that he appeared alert and oriented and was in no apparent distress. AR 345. His mood, judgment, and orientation were within normal limits. *Id.* She noted that Mr. Johnson wanted to see his psychiatrist, as he felt depressed and was still hearing voices. AR 346. The medications "are helping but not completely." *Id.* Ms. Couser questioned Mr. Johnson twice about self-harm, and although Mr. Johnson indicated that he has "never tried to 'kill or hurt' himself," he "has problems right now." *Id.* She assessed Mr. Johnson's mental health as "unstable . . . at this time with some psychosis and no relief from current medications." *Id.*

### 5. Neuropsychological evidence

#### a. December 16, 2015 neuropsychological tests

Psychology student Saskia DeVaughn interviewed Mr. Johnson and administered an array of neuropsychological tests over a period of approximately five hours on December 16, 2015. AR 332. She was supervised by Jodi Pinn, Ph.D, Irene Guerra, Ph.D, and Charles Preston, Ph.D. *Id.* Ms. DeVaughn's progress notes from that day noted that Mr. Johnson "was oriented to time and location, but was unable to name the specific name of the place." *Id.* At the beginning of the testing, he did not maintain eye contact. He displayed flat affect with linear and goal directed thought process with pessimistic content. *Id.*

The results of the neuropsychological examination were memorialized in a Neuropsychological Brief Screen Report which includes references to both Ms. DeVaughn and Dr.

Pinn as authors of the report.[7]  AR 356–61.

### b.    Neuropsychological brief screen report

According to the report, Mr. Johnson complained of chronic fatigue and the resulting inability to focus on a task for more than 15 minutes.  AR 356.  He reported memory problems and difficulty in keeping track of what is being said during conversations.  *Id.*  He also complained of difficulties maintaining attention over long periods of time and difficulty carrying out multistep commands.  *Id.*

With respect to his mental impairments, Mr. Johnson reported having been diagnosed with schizoaffective disorder, that he heard voices shouting his nickname and other sounds, and that he had thoughts that people were out to get him.  AR 357.  He also reported experiencing persistent depressive mood and isolating himself as a result.  Mr. Johnson stated that he took frequent naps during the day, and that his medication had only been effective for his sleep.  He described himself as becoming irritated frequently, experiencing sudden mood swings and low self-esteem, and having difficulty motivating himself.  *Id.*

Mr. Johnson stated that his mental difficulties began after his parents, with whom he was close, passed away.  He reported receiving financial and emotional support from one of his two sisters, but was troubled by the way his brothers and other people treat him because of his homelessness.  *Id.*  The report noted that Mr. Johnson "had considerable difficulty in recounting his occupational history" and "was a poor historian about his psychosocial and occupational past." *Id.*

The neuropsychological tests assessed Mr. Johnson's functioning in eight areas.  His intellectual functioning fell in the "borderline range."  AR 358.  His performance on tasks measuring attention was variable: digit span and cancellation were within normal limits, visual scanning and motor speed were mildly impaired, and number and letter sequencing were severely impaired.  *Id.*  His performance on immediate memory tests were also variable: his ability to learn verbal information in a story format was mildly impaired, but his ability to learn a list over four

---

[7] The parties dispute the authorship of the report, the nature and significance of Ms. DeVaughn's supervisors' contributions to the report, and their supervision of Ms. DeVaughn's work.

trials was severely impaired. *Id.* His performance on delayed memory tests was worse: his ability to recall list words after a delay was mildly impaired, but his abilities to recognize that information among new information, to recall information in the story format presented earlier, and to recall a figure drawing were severely impaired. AR 358–59. Mr. Johnson's performance on visuospatial and constructional abilities was variable: line orientation was within normal limits, but figure copying and coding were severely impaired. AR 359. His language abilities were similarly variable: picture naming was within normal limits, semantic fluency was moderately impaired, and comprehension was severely impaired. *Id.* Mr. Johnson's reasoning and problem solving were impaired—in particular, his judgment about everyday pragmatic and safety situations was severely impaired. AR 359–60. The report notes that Mr. Johnson demonstrated impaired executive functions and that he had surprisingly superior performance on more difficult items, which suggested the "presence of confusion and active psychotic symptoms." AR 360. His emotional functioning test results could not be interpreted. *Id.*

On May 17, 2016, Dr. Preston, one of Ms. DeVaughn's supervisors, submitted a letter correcting some errors in the neuropsychological report. AR 363. Specifically, the letter noted that: (1) Mr. Johnson was 51 years old, not 55 years old; (2) Mr. Johnson was diagnosed with schizoaffective disorder with depressive, not manic symptoms; and (3) Mr. Johnson was married until 1996, not 2012. *Id.*

### B. Administrative Proceedings

As discussed above, Mr. Johnson's application for SSI was denied initially and upon reconsideration. He requested a hearing before an ALJ. At the hearing, the ALJ received testimony from Mr. Johnson and from a vocational expert ("VE").

#### 1. Mr. Johnson's Testimony

Mr. Johnson testified at length about his general living situation and daily activities, his symptoms, and his work history and difficulty functioning in work environments. AR 36–74.

Mr. Johnson testified extensively regarding his daily activities. When asked to describe his average day, Mr. Johnson testified:

A. I get up maybe 9:00. I'll just walk five minutes to Starbucks and

13

I'll just get a cup of coffee.  I'll go to the library.  I'll just sit there.

Q.  Okay.  When you go to Starbucks or you go to the library, you
said you normally take public transportation?

A.  Yes, and sometimes I ride my bike down there.

AR 46–47.  He testified that he would stay at Starbucks for half an hour or an hour, and then go to

the library, where he would sit for hours not doing anything.  AR 67.

Mr. Johnson testified that he has a membership to 24-Hour Fitness and that he would go to

the gym at least once a day to take a shower.  AR 52, 54.  He testified that he usually did not work

out at this facility, but may sit on an exercise bike for about 10 minutes.  AR 52–53; *see also* AR

66 ("A. I used to like working out.  Now I haven't did that in so long.  Q. So when you go cycling,

you don't really enjoy it?  You just kind of do it and stop?  A. I don't cycle now.  I just walk to the

gym and use my bike once in a while.").  Mr. Johnson also uses the gym's sauna for five to ten

minutes.  AR 54.

Mr. Johnson further testified regarding his limited social interactions.  He stated that he

rarely spoke to anyone at the gym.  AR 53 ("A. In the sauna, there are maybe like three people.

It's a men's sauna.  Q. Do you socialize while you're there?  A. Rarely.  I say hi, how are you

doing or something like that.  A couple of times I got assaulted a couple. . . . I didn't do anything

about it."); AR 60 ("Q.  . . . Like you said you go to the gym daily and I assume that at the gym

most times you go there, there are other people there, right?  A. Yes, but I don't socialize with

them.  I don't think they would socialize with me either.  Q. Okay.  Alright.  Fa[i]r enough.").  Mr.

Johnson also testified that he did not associate with some of his family members or other friends:

Q. . . . And do you associate with your family members at all?

A. My other brother that filled out my, really he, he really mentally
abused me when I was up there for a year in Stockton.

Q.  Okay.  So you don't associate with him anymore?

A. No.

Q. You have any other friends?  Do you go to any support groups or
a monthly meeting?

14

1    A. My other brother, he comes from Modesto.  He comes down and
2    he counsel me.

3    Q. Okay.  You go to any support groups, church groups, sports
4    clubs, anything like that?

5    A. No.

6   AR 54–55.  Mr. Johnson stated that he was disinterested in being with others.  AR 67 ("Q. . . . Do

7   you have any interest in being with other people?  A. No I don't.  Q. How come?  A. It's just the

8   way I am.  I don't want to be around them.").

9        Mr. Johnson also described how his mental health impacted his experience at work, and

10  eventually prevented him from keeping a job.  AR 43–44 ("[A]t work I was having problems just

11  show to work.  And then half hour and my mind, you can say I just shut down."); *see also* AR 45,

12  47, 56–57, 58.  He also testified regarding his symptoms, including auditory hallucinations, sleep

13  disturbances, memory and attention problems, mood swings, paranoia, and depression.  AR 42,

14  45–48, 51–52, 54, 57–60, 62, 66, 68–73.

15       In particular, Mr. Johnson testified that his auditory hallucinations caused him to walk

16  away from his work.  AR 69 ("A. It makes me really feel like I shouldn't be working.  When I

17  hear those voices, I shouldn't be there.  It makes me upset that I'm there.  Q. That's when you

18  walk off?  A. Yes.").  He says that he still experiences these auditory hallucinations even though

19  he is taking medication as prescribed.  AR 69–70.  He hears voices two to three times a week,

20  including when he dreams, which irritates and upsets him, and also interferes with his sleep and

21  ability to concentrate.  AR 47, 57, 68–69.  Mr. Johnson testified that he wakes up three to four

22  times on a nightly basis.  AR 68 ("[W]hen I hear like, I see things, I hear a voice call my name and

23  I dream.  I may wake up and I hear things, it makes my personality change too.  Like I'm not all

24  there. . . . [I]t just makes me shut down.").  As a result, he is often fatigued and takes multiple naps

25  a day, sometimes falling asleep in public areas like the library or at the gym.  AR 54 ("A.

26  Sometimes I'll sit there and I'll fall asleep too.  I have sleeping problems.  Q. So you sleep there

27  like in the locker room or something?  A. A couple of times in the afternoon, I'll sit in the sauna

28  may be 5-10 minutes and I'll go out and I'll lay down.  I'll lay down on the ground and fall asleep

because of the stress of the day."); *see also* AR 68. He says he experiences decreased energy as a result of his hallucinations, anxiety, and depression. AR 69.

Mr. Johnson described his memory and attention problems. He testified, "If somebody tell[s] me something, it's like I can't, it doesn't, not always. Sometimes I can't really follow instruction. I have a loss of memory. Like you say it one time, you have to say it 3-4 different times. If I talk to someone on the phone and they tell me something to do like I have hard time comprehending, especially when it comes to reading." AR 70. He also testified that he could only hold his concentration on a particular task for 15 minutes, after which he might not be able to return to the task. AR 71. Mr. Johnson stated that he was easily distracted, although if he had assistance, he might be able to maintain concentration on a task for about an hour. AR 72. His attention impairment also led him to falling asleep at work. AR 58 ("It's like I have no attention span, no desire."). Throughout his testimony, Mr. Johnson often did not provide direct answers to questions asked of him. The following exchange is representative:

> Q. Now with respect to these auditory hallucinations, the hearing voices and so forth, how long has this been going on?
>
> A. Maybe a little bit, my mother was sick and I was taking care of her. My mom and dad, me and my brother were living in the house and she died in the house. My mom and dad died and then my sister, other sister, she passed away like three years later. So I'm trying to get in [contact] with my son that's, it's like my whole day is full of stress and depression. That's why I haven't done anything about.

AR 48.

Mr. Johnson stated that he could not return to his sky cap job because of his mood swings. When asked how his mood swings interfere with his work, he said, "I guess my mood, I just, my mind wanders. I just can't really deal with it. . . . I think it has to do with my history and my, I guess my personality and it's how I really live in isolation. My brother says I'm a hermit. I can really say I have mental problems." AR 62. He stated, "It gets you so angry or frustrated and it's like I just shut down. I can't function and that's one, that happens a lot. . . . I just can't really function." AR 51–52.

16

Mr. Johnson also explained that his paranoia interfered with his ability to be with others and to interact with coworkers. AR 73 ("Q. . . . You stated that you fear other people are out to get you. Does this prevent you from interacting with others? A. Definitely. . . . I feel like they don't want me there. . . . I don't meet their standards. . . . It makes me irritated frustrated. . . . I just walk off."); *see also* AR 42, 60. In general, Mr. Johnson testified to his inability to be around others, particularly in a work environment: "Coworkers. Just a lot, just like I have problem working with society. I get irritated and frustrated. I guess because of all my problems. . . . My mind is really just. You know, I say that I'm good now. I'm okay now, but when I get caught up in that environment, I'll change. I'm afraid for myself. I'm afraid for others too." AR 59. When questioned what he meant by "that environment," Mr. Johnson specified, "a workplace environment." He explained that he had trouble even dealing with others on an individual basis. AR 60 ("Q. Like with lots of people, like a grocery store with lots of people? Is that? Are you okay? A. Even one-on-one.")

Mr. Johnson also described the medical treatment he had received so far. He stated that he currently sees Dr. Le twice a month for depression and takes his medications every day. AR 45–46, 65. He also sees other doctors as needed. AR 56. Despite taking medication, he stated that he still experiences depression symptoms on a daily basis, including sadness, thoughts of suicide, wanting to avoid other people, guilt, and worthlessness. AR 47, 66. When asked whether he had sought mental health treatment prior to 2015, Mr. Johnson responded:

> A. I go to group therapy.
>
> Q. How long have you been doing that?
>
> A. I missed a couple months.
>
> Q. Okay. When did you start going to group therapy?
>
> A. I can't recall. I don't know.

AR 45. He later testified that he did not seek treatment prior to September 2015 in part because he lacked insurance. AR 64. His sister first took him to see a psychiatrist in October 2015. AR 65.

Mr. Johnson missed a consultative exam that the ALJ had scheduled for him. He testified

17

that he received a letter advising him of the exam, but he did not understand it. AR 63. He

indicated that he would attend a consultative exam if the ALJ ordered another one. *Id.* At this

point, the ALJ asked:

> ALJ: Counsel, if I were, I haven't decided yet. But if I
> were to order another CE to address some of the psychiatric
> concerns, do you have any objection or any comment on that?
>
> ATTY: I think that he's gone to a quite extensive
> psychiatric examination and assessment. The neuropsychiatric
> report is pretty extensive.
>
> ALJ: All right. Thank you. Go ahead. You said you want
> to go ahead and address some of the medical issues. Go ahead.
>
> ATTY: I mean if you feel like the record is incomplete
> without it.
>
> ALJ: Okay.
>
> ATTY: It's fine.
>
> ALJ: All right.
>
> ATTY: Okay.

AR 66. The ALJ did not order another consultative exam.

### 2. Testimony of the Vocational Expert

Vocational expert Kenneth Ferra testified at the hearing. AR 26, 75–79. The ALJ

presented Mr. Ferra with a hypothetical claimant who can lift/carry 25 pounds frequently and up to

50 pounds occasionally, is able to stand, walk, and sit six hours in an eight-hour workday, but who

is limited to performing simple repetitive tasks and occasional interactions with coworkers and the

public. AR 76–77. Mr. Ferra testified that such a person could not perform Mr. Johnson's past

work, but he or she could work as a cleaner, harvest worker, or hand packager. *Id.*

In response to questioning from Mr. Johnson's counsel, Mr. Ferra testified that a

hypothetical person with "severely impaired judgment, severely being about 66 percent of the

workday, but with impaired judgment about everyday pragmatic and safety situations, as indicated

18

in" the neuropsychological report, and who could not be aware of normal hazards and take appropriate precautions, as indicated in Dr. Le's MIQ, could not perform any jobs. AR 78. Mr. Ferra also testified that a hypothetical person who is unable to remember work-like procedures, cannot remember or carry out short and simple instructions, and cannot sustain an ordinary routine without special supervision, as indicated in Dr. Le's MIQ, could not perform any jobs. *Id.* Finally, Mr. Ferra testified that a hypothetical person who was unable to ask simple questions or request assistance, accept instructions, and respond appropriately to supervisors or coworkers, as indicated in Dr. Le's MIQ, could not perform any jobs. AR 79.

### 3. The ALJ's Decision

At step one of the sequential analysis, the ALJ found that Mr. Johnson had not engaged in substantial gainful activity since the alleged onset date of January 19, 2015. At step two, the ALJ found that Mr. Johnson has the following severe impairments: schizoaffective disorder, depression, and anxiety (20 C.F.R. § 416.920(c)). The ALJ found that Mr. Johnson did not suffer from any medically determinable physical impairments.

At step three, the ALJ determined that, Mr. Johnson did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d), 416.925, and 416.926). The ALJ engaged in the paragraph B analysis and found that Mr. Johnson did not satisfy the paragraph B criteria. Specifically, the ALJ found that Mr. Johnson's testimony that he gets up, takes a five minute walk to Starbucks for coffee, goes to the library and sits there, and also sometimes takes public transportation or rides his bike suggests that Mr. Johnson has no limitations in activities of daily living. AR 21. However, because Mr. Johnson is homeless and his medical care providers occasionally observed that his grooming and hygiene appeared "marginal," the ALJ found a mild restriction in activities of daily living. *Id.* With respect to social functioning, the ALJ noted that Mr. Johnson's repeated testimony that he does not like people and does not get along with others was consistent with what he told his medical providers, but that other medical reports indicated that he was consistently "cooperative" and "demonstrated good eye contact" on other occasions. *Id.* Because Mr. Johnson testified that he has a gym

membership "where he exercises and speaks to others while using the sauna," the ALJ determined that a finding of moderate limitation "more than adequately accounts for impairment related limitation" in social function. *Id.* (emphasis original). With respect to concentration, persistence, and pace, the ALJ noted that Mr. Johnson testified that he hears voices and has dreams that "really affect him," and that Mr. Johnson told his medical providers that he was unable to or had difficulty with work because he could not follow instructions and/or understand them. *Id.* However, the ALJ cited Mr. Johnson's test results from the neuropsychological examination showing that "his performance on tasks measuring attention was noted to be 'variable'" and that his selective attention and auditory attention was within normal limits. AR 21–22. The ALJ also noted that even though Mr. Johnson had severely impaired immediate memory abilities to learn semantically unrelated words and recall them, he had only mildly limited abilities to learn in story format and in delayed memory. *Id.* Finally, the ALJ stated that "[o]f note, the claimant's ability to exercise daily, is additional evidence of ability to concentrate." AR 22. On that basis, the ALJ determined that Mr. Johnson was only moderately impaired as to concentration, persistence, or pace. *Id.* Finally, the ALJ stated that Mr. Johnson had not experienced any episodes of decompensation of extended duration: "Evidence in the record does not support any episodes of decompensation of extended duration, as defined by code." *Id.* (emphasis original).

The ALJ also engaged in the paragraph C analysis and found that Mr. Johnson did not satisfy the paragraph C criteria either. Again, the ALJ noted that "there have been no repeated episodes of decompensation." *Id.* The ALJ also concluded that Mr. Johnson did not have a "residual disease process" such that even a minimal increase in mental demands would cause him to decompensate, and as a homeless person, Mr. Johnson lived in various shelters and thus did not require a "highly supportive living arrangement." *Id.* Having determined that Mr. Johnson's impairments did not meet or equal a listed impairment, the ALJ proceeded to step four.

At step four, the ALJ determined that Mr. Johnson was not able to perform his past work as a sky cap, but that he has the RFC to perform work at all exertional levels with the following non-exertional limitations: simple, repetitive tasks, and only occasional interactions with co-workers and the public. *Id.* In so concluding, the ALJ gave only some weight to treating

physician Dr. Le's MIQ opinion, only some weight to the neuropsychological report to the extent it was "based on clinical testing," and only very little weight to Ms. Egbujor's opinion. AR 25–26. Based on Mr. Ferra's testimony, the ALJ concluded that Mr. Johnson was "not disabled." AR 26–28.

The Appeals Council denied Mr. Johnson's request for review, and the ALJ's decision became the Commissioner's final decision. Mr. Johnson now seeks judicial review, arguing that the ALJ erred by (1) concluding, at step three of the sequential analysis, that his impairments did not meet or equal the severity of listed impairments; (2) improperly discrediting or discounting entirely the opinions of Dr. Le and Ms. Egbujor and the neuropsychological report; and (3) improperly assessing Mr. Johnson's own reports of the severity of his symptoms. The Commissioner contends that the ALJ's decision is correct and free of legal error.

## III.    STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has the authority to review the Commissioner's decision to deny benefits. The Commissioner's decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards. *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Moncada v. Chater*, 60 F.3d 521, 523 (9th Cir. 1995). In this context, the term "substantial evidence" means "more than a mere scintilla but less than a preponderance—it is such relevant evidence that a reasonable mind might accept as adequate to support the conclusion." *Moncada*, 60 F.3d at 523; *see also Drouin v. Sullivan*, 966 F.2d 1255, 1257 (9th Cir. 1992). When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. *Drouin*, 966 F.2d at 1257; *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Where evidence exists to support more than one rational interpretation, the Court must defer to the decision of the Commissioner. *Moncada*, 60 F.3d at 523; *Drouin*, 966 F.2d at 1258.

## IV.    DISCUSSION

Mr. Johnson contends that the ALJ erred in two main respects. First, he argues that the ALJ erred at step three of the sequential evaluation by failing to find that his impairments met or

equaled a listed impairment.  Second, Mr. Johnson argues that, in determining that he has the RFC to perform unskilled work at all exertional levels with certain non-exertional limitations, the ALJ improperly discredited Dr. Le's and Ms. Egbujor's opinions and the neuropsychological report.  Relatedly, Mr. Johnson contends that at both steps three and four, the ALJ erred in rejecting his statements regarding his symptoms and functional limitations as not credible.  Because the resolution of the third issue raised by Mr. Johnson—i.e., the ALJ's rejection of Mr. Johnson's statements regarding his symptoms and functional abilities as not credible—informs the first and second issues regarding the ALJ's step three and step four analyses, the Court addresses the ALJ's credibility assessment first.

### A.    The ALJ's Credibility Findings

In finding that Mr. Johnson is not disabled, the ALJ concluded that "[a]lthough the record supports the severe mental impairments found herein, evidence in the record does not support the severity of symptoms as alleged by the claimant."  AR 23.  Mr. Johnson argues that the ALJ's primary reliance on what he described as fatal inconsistencies in Mr. Johnson's testimony was error.  Dkt. No. 22 at 16.  The Commissioner responds that Mr. Johnson is simply advancing an alternate interpretation of the evidence, and the ALJ's conclusion was supported by substantial evidence.  Dkt. No. 23 at 8.

In evaluating the credibility of a claimant's testimony regarding subjective symptoms, an ALJ must engage in a two-step analysis.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged."  *Id.* at 1036 (internal citations and quotation marks omitted).  The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom [he] has alleged; [he] need only show that it could reasonably have caused some degree of the symptom."  *Id.* (internal quotation omitted).  "[O]nce the claimant produces objective medical evidence of an underlying impairment, an adjudicator may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the alleged severity . . . ."  *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991)

(internal citation omitted).  At the second step, unless there is affirmative evidence showing that the claimant is malingering, "the ALJ can reject the claimant's testimony about the severity of [his] symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996).  "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  (internal citations omitted).

Because the ALJ did not find that Mr. Johnson was malingering, he was required to provide clear and convincing reasons to justify his rejection of Mr. Johnson's testimony about his symptoms.  The Court concludes that the ALJ failed to do so.

### 1.    Objective medical evidence of underlying impairment

The ALJ concluded that Mr. Johnson's medically determinable mental impairments could reasonably be expected to cause the symptoms he alleges, such as an inability to get along with others, hearing voices or noises, thoughts of suicide, being offended easily, thinking that people are "out to get him," and feelings of inferiority, helplessness, and depression in large crowds.  AR 23.  Neither party challenges this conclusion.

### 2.    The ALJ's analysis regarding severity of symptoms

The ALJ determined that Mr. Johnson's statements regarding the intensity, persistence, and limiting effects of the symptoms are inconsistent with the medical evidence and other evidence in the record.  In particular, the ALJ concluded that objective medical evidence, Mr. Johnson's improvement following medication, his inconsistent reports to medical care providers, and his testimony regarding his activities of daily living did not support his alleged severity of symptoms.

#### a.    Objective medical evidence

The ALJ noted that objective medical evidence consistently showed that when Mr. Johnson visited his doctors, he was "alert and oriented," "cooperative," demonstrated "normal psychomotor activity," and had fair and/or intact insight and judgment.  AR 23; *but see supra* n.4.  As the Commissioner acknowledges, the ALJ was not permitted to rely solely on objective medical evidence in rejecting Mr. Johnson's statements about his symptoms.  Dkt. No. 23 at 4; *see*

*also* SSR 16-3p, 2017 WL 5180304, at *5 (Oct. 25, 2017)[8] ("We must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record. . . . However, we will not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.").  The ALJ was required to look to other evidence, including Mr. Johnson's own statements, medical sources, and any other sources that might have information about his symptoms, before discounting Mr. Johnson's testimony about the severity of his symptoms.  SSR 16-3p, 2017 WL 5180304, at *6.

### b.     Improvements following medication

The ALJ noted that Mr. Johnson's symptoms showed improvement after he began taking medication, concluding that the symptoms were therefore less severe than Mr. Johnson asserted. AR 24.  However, the Ninth Circuit has emphasized that "it is error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working."  *Garrison v. Colvin*, 759 F.3d 995, 1017 (9th Cir. 2014).  Furthermore, reports of "improvement" in the mental health context "must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in a workplace.  Caution in making such an inference is especially appropriate

---

[8] SSR 16-3p, originally "effective" on March 28, 2016, was republished on October 25, 2017, with the revision indicating that SSR 16-3p was "applicable [rather than effective] on March 28, 2016."  *See* 82 Fed. Reg. 49462, 49468 & n.27, 2017 WL 4790249, 4790249 (Oct. 25, 2017); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017).  Other than also updating "citations to reflect [other] revised regulations that became effective on March 27, 2017," the Administration stated that SSR 16-3p "is otherwise unchanged, and provides guidance about how we evaluate statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims ...."  *Id.* The Ninth Circuit recently noted that SSR 16-3p is consistent with its prior precedent.  *Trevizo v. Berryhill*, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (SSR 16-3p "makes clear what [Ninth Circuit] precedent already required").  Thus, while SSR 16-3p eliminated the use of the term "credibility," case law using that term is still instructive in the Court's analysis.

1    when no doctor or other medical expert has opined, on the basis of a full review of all relevant

2    records, that a mental health patient is capable of working or is prepared to return to work." *Id.* at

3    1017–18 (internal citations omitted).

4    Here, no physician or other medical expert ever opined that Mr. Johnson was capable of

5    working or was prepared to return to work. The ALJ thus relied too heavily on indications in the

6    medical record that Mr. Johnson's symptoms showed improvement after receiving medication,

7    while ignoring other contrary evidence. For example, Dr. Le concluded that Mr. Johnson "has

8    been compliant with taking meds and clinic follow up, with partial response to medications" and

9    that his "symptoms [have been] reduced with meds, but Mr. Johnson has continued to have

10   moderate residual auditory hallucination and paranoia." AR 315. Dr. Le also observed that the

11   "medications have started to decrease his paranoia and enable him to come to clinic regularly for

12   assessment. Yet, he is still very grossly impaired from years of untreated symptoms and chronic

13   homelessness (since 1996). He has remained very paranoid in unfamiliar and crowded

14   situation[s]." AR 317. Additionally, the neuropsychological exam—which Ms. DeVaughn

15   administered after Mr. Johnson had been taking medications for over two months (*compare* AR

16   356 *with* AR 325)—demonstrated variable attention, impaired immediate and delayed memory,

17   and impaired executive functions. AR 360. Further, following Mr. Johnson's most recent visit

18   with Dr. Chuang on March 29, 2016, Dr. Chuang noted that Mr. Johnson "[a]voids people still,

19   admits to easy paranoia." AR 342. Moreover, the ALJ did not address the most recent evidence

20   in the record from Ms. Couser, which is inconsistent with the conclusion that Mr. Johnson's

21   symptoms had improved to any substantial degree. AR 346 (noting that "Medications are helping

22   but not completely. Feels depressed, still hearing voices. . . . Unstable [mental health] at this time

23   with some psychosis and no relief from current medications.").

24   The ALJ stated that he "could not overlook . . . Dr. Chuang's report that the claimant is a

25   'poor historian overall.'" AR 24. Apparently, the ALJ believed that Mr. Johnson's status as a

26   "poor historian" supported discrediting his testimony. The ALJ did not address at all the

27   possibility that Mr. Johnson's status as a "poor historian" was a reflection of his mental

28   impairment. However, SSR 16-3p states:

25

> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person. Rather, our adjudicators will focus on whether the evidence establishes a medically determinable impairment that could reasonable by expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities.

SSR 16-3p, 2017 WL 5180304, at *11.

The ALJ's assessment of the evidence of improvement in Mr. Johnson's symptoms following medication improperly ignores evidence of insufficient improvement. This assessment is not a legally sufficient basis for discrediting Mr. Johnson's testimony concerning the severity of his symptoms.

### c. Purported inconsistencies

The ALJ also relied on purported inconsistencies between Mr. Johnson's hearing testimony and statements made to his medical examiners in discounting Mr. Johnson's credibility. First, the ALJ noted that Mr. Johnson told Dr. Chuang or her staff that his family had emotionally abused him by making derogatory remarks, threatening to throw him out on the street, and denying him access to food. The ALJ found these statements inconsistent with Mr. Johnson's testimony that one of his sisters gives him some financial assistance and allows him to use her mailing address. The record reveals no such inconsistency. Mr. Johnson testified that the only members of his family with whom he is still in contact are one sister and one brother. AR 74; *see also* AR 54 ("Q. Okay. And do you associate with your family members at all? A. My other brother that filled out my, really he, he really mentally abused me when I was up there for a year in Stockton. Q. Okay. So you don't associate with him anymore? A. No."). The medical records indicate he also told his medical examiners that he is in contact with one sister and one brother, but not his other siblings. AR 342 ("talks with one sister in SJ and a brother in Stockton, doesn't talk to other brothers or sisters"); AR 356 ("Mr. Johnson was born and raised in San Jose living with mother and father, as well as his 4 brothers and two sisters. . . . [H]e receives financial and

emotional support by one of his sisters. Currently Mr. Johnson is troubled by the way his brothers as well as other people treat him as a result of his homelessness."). Although the number of Mr. Johnson's siblings may have created some confusion, there is nothing inconsistent about Mr. Johnson remaining in contact with family members who treat him well and do not emotionally abuse him, and avoiding contact with others.

Second, the ALJ criticized Mr. Johnson for stating that he "goes to group therapy," but also stating that he "missed a few months" and that he "didn't know how many times I went . . . ." AR 24. The ALJ appears to have concluded that Mr. Johnson rejected recommended treatment, and that he dissembled about whether he did or did not attend group therapy. The ALJ observed that "[i]f impairment-related symptoms are as severe as the claimant alleges, it is reasonable that the claimant would pursue any treatment options offered by medical professionals." AR 24. This conclusion is problematic. An examination of Dr. Chuang's treatment notes reveals recommendations for both group therapy and individual therapy. The record is ambiguous regarding whether Mr. Johnson ever attended group therapy, and if he did, whether it was effective. *See* AR 342, 330.[9] In addition, the ALJ appears not to have considered whether Mr. Johnson's mental impairments made it difficult for him to attend group therapy, and whether this difficulty, rather than an unwillingness to engage in recommended treatment, explains his hearing testimony and his conduct. SSR 16-3p, 2017 WL 5180304, at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on [the basis that the frequency or extent of treatment sought is not comparable with his subjective complaints] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."). The record is replete with reports of Mr. Johnson's paranoia—including Dr. Chuang's note from the March 29, 2016 visit that stated, "Avoids people still, admits to easy paranoia." AR 342. The ALJ "may not substitute his own view of the effects

---

[9] The evidence in the record provided does not show that Mr. Johnson attended group therapy, but the ALJ afforded Mr. Johnson the opportunity to add additional evidence to the record after the hearing. AR 80. If Mr. Johnson had begun attending group therapy between his last recorded medical appointment on March 29, 2016 and the hearing on May 19, 2016, he could have supplemented the record with that evidence—but he apparently did not do so.

of a mental impairment on a claimant for that for an examining psychologist." *Hall v. Colvin*, No. 12-cv-5672-JSC, 2013 WL 5663087, at *8 (Oct. 17, 2013) (rejecting ALJ's conclusion that plaintiff's discontinuation of inpatient treatment, which undermined her attempts maintain custody of her children, was inconsistent with her mental impairment) (internal quotation marks and citations omitted). Furthermore, "the Ninth Circuit has repeatedly and particularly criticized the use of a lack of treatment to reject mental complaints both because mental illness is 'notoriously underreported' and because 'it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation.'" *Sababu v. Colvin*, No. 14-cv-05139-DMR, 2016 WL 1110264, at *9 (N.D. Cal. Mar. 22, 2016) (quoting *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). The ALJ's failure to consider the record as a whole on this point in assessing Mr. Johnson's credibility was error.

Additionally, the ALJ took special note of statements in Dr. Chuang's progress notes from her initial examination of Mr. Johnson to support his finding that Mr. Johnson's testimony was inconsistent with other evidence in the record. The ALJ noted that during his visit with Dr. Chuang, Mr. Johnson stated that he "gets along with mother, but then says she wouldn't allow him to stay with her when she was alive, when interviewer pointed out inconsistency, seems startled and quite puzzled." AR 24 (citing AR 323). This single incident, which occurred prior to Mr. Johnson receiving any mental health treatment, is at most a minor inconsistency that appears to concern his relationship with his deceased mother, rather than the severity of his symptoms. Standing alone, this minor inconsistency about a collateral matter cannot support an adverse credibility determination under the clear and convincing standard. *See, e.g.*, *Todd v. Astrue*, No. 11-cv-782-DTB, 2011 WL 5909840, at *3 (C.D. Cal. Nov. 28, 2011); *Leon-Barrios v. INS*, 116 F.3d 391, 393 (9th Cir. 1997) ("Generally, minor inconsistencies and minor omissions relating to unimportant facts will not support an adverse credibility finding."); *Hatcher v. Sec'y, Dep't of Health and Human Servs.* 898 F.2d 21, 24 (4th Cir. 1989) (holding that a "minor inconsistency in testimony" is not sufficient for purposes of adverse credibility finding).

### d.      Activities of daily living

A claimant's daily activities may support an adverse credibility finding if a claimant is able

to spend a substantial part of his day engaged in pursuits involving the performance of physical functions or skills that are transferable to a work setting. *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007). The ALJ found that "the claimant's activities of daily living do not lend support [to] the level of severity he alleges." AR 24. In so finding, the ALJ mischaracterized Mr. Johnson's testimony at the hearing and selectively quoted it out of context. Specifically, the ALJ stated that Mr. Johnson's "ability to bike to Starbucks to enjoy a cup of coffee, to go to the library, to go to the gym and bike and use the sauna, are specific examples of intact social functioning and concentration and persistence that are relevant to evaluating his ability to perform basic work activity." *Id.* However, that characterization of Mr. Johnson's description of his activities is not supported by the record.

When he visits Starbucks, the gym, and the library, Mr. Johnson does not engage in the normal activities that one would expect at those locations. For example, Mr. Johnson testified that his purpose in going to the gym is to bathe himself, and he repeatedly confirmed that he does not go there to exercise. AR 52–53 ("Q. Do you work out at this facility? A. No, I don't. . . Sometimes I may sit on a cycle for about 10 minutes."); AR 54 ("Q. . . . And you get to the gym, how often do you go to the gym[,] a couple times a week? A. I usually go every day so I can take a shower."); AR 66 ("A. I used to like working out. Now I haven't did that in so long. Q. So when you go cycling, you don't really enjoy it? You just kind of do it and stop? A. I don't cycle now. I just walk to the gym and use my bike once in a while."). In fact, Mr. Johnson has fallen asleep at the gym and the library on multiple occasions, and been asked to leave. AR 54 ("A. Sometimes I'll sit there and I'll fall asleep too. I have sleeping problems. Q. So you sleep there like in the locker room or something? A. A couple of times in the afternoon, I'll sit in the sauna maybe 5-10 minutes and I'll go out and I'll lay down. I'll lay down on the ground and fall asleep because of the stress of the day."); AR 68–69 ("A. Yes, sometimes I fall asleep at the library. . . . Q. Okay. Have you ever fallen asleep at the gym? A. Yes, a couple of times. Q. Couple of time[s]? What happened when you fell asleep? A. They woke me up. Q. They woke [you up]? Did they let you stay there? A. No.").

When asked to describe his average day, what time he gets up, where does he get

breakfast, and so forth, Mr. Johnson responded that he normally gets up at 9:00 and walks to Starbucks for coffee for a half hour or hour, and then he goes to the library and sits there for hours—not using any of the library's services or doing anything else, but just sitting there. AR 46–47; AR 67 ("Q. You just sit there? A. Yes. Q. For how long? . . . You'll just sit at the library for four hours and not do anything, just sit there? A. I just sit there."). Additionally, Mr. Johnson repeatedly testified that he does not socialize with others at those places and, in fact, is not interested in social interactions. AR 53 ("Q. Talk to anybody there? A. Rarely. In the sauna, there are maybe like three people. It's a men's sauna. Q. Do you socialize while you're there? A. Rarely. I say hi, how are you doing or something like that. A couple of times I got assaulted a couple."); AR 60 ("Q. Like with lots of people, like a grocery store with lots of people? Is that? Are you okay? A. Even one-on-one. Q. Is it really infrequent. Like you said you go the gym daily and I assume that at the gym most times you go there, there are other people there, right? A. Yes, but I don't socialize with them. I don't think they would socialize with me either. Q. Okay. All right. Fa[i]r enough."); *see also* AR 67 ("Q. How about, does this loss of interest affect your interaction with people? Do you have any interest in being with other people? A. No I don't."). Furthermore, Mr. Johnson testified that walking to Starbucks, sitting on an exercise bike at the gym, and using the sauna are activities of short duration. AR 46 (five minute walk to Starbucks); AR 53 ("Sometimes I may sit on a cycle for about 10 minutes."); AR 54 ("I'll sit in the sauna maybe 5-10 minutes . . . .").

Mr. Johnson's testimony does not support the ALJ's conclusion that these activities are examples of "intact social functioning and concentration and persistence that are relevant to evaluating his ability to perform basic work activity." AR 24. The ALJ appears not to have considered that these activities are examples of behaviors of a person who is chronically homeless and seeking to avoid being out on the street. Having mischaracterized the nature of the activities in which Mr. Johnson engaged, the ALJ cannot rely on that mischaracterization to discredit Mr. Johnson's testimony regarding the severity of his symptoms.

Even if the Court were to accept the ALJ's findings regarding Mr. Johnson's daily activities, the ALJ did not point to any evidence showing that these daily activities were

transferable to a work environment. The ALJ did not explain how getting coffee, sitting and doing nothing at the library for hours, showering at the gym, and sitting on a stationary bike or in the sauna for five to ten minutes are activities that transfer to a work setting. Because the ALJ did not make "specific findings relating to [the daily] activities and their transferability," his conclusion that Mr. Johnson's daily activities warrant an adverse credibility determination was error. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

Because the ALJ did not provide clear and convincing reasons to discredit Mr. Johnson's testimony regarding the severity of his symptoms, Mr. Johnson's motion for summary judgment is granted on this point, and the Commissioner's cross-motion is denied.

### B.    The ALJ's Assessment of the Opinions of Treating Physicians and Other Sources

In determining that Mr. Johnson's impairments do not meet or equal a listed impairment and that he has the RFC to perform some work, the ALJ gave only some weight to treating physician Dr. Le's MIQ. In addition, the ALJ classified Ms. Egbujor's certification of disability for general assistance and the neuropsychological report as "other source" opinions, assigning the former "very little weight" and the latter only "some weight" insofar as it was based on clinical testing. Mr. Johnson argues that the ALJ should have given Dr. Le's medical source statement and the neuropsychological report controlling weight, and that the ALJ erred in giving Ms. Egbujor's medical source statement only very little weight. The Commissioner maintains that the ALJ gave good reasons supported by substantial evidence for his assessment of this medical evidence.

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester*, 81 F.3d at 830. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Id*.

A treating physician's opinion is entitled to "controlling weight" if it "is well-supported by

31

1   medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the

2   other substantial evidence" in the record.  20 C.F.R. § 416.927(c)(2).  "However, '[t]he ALJ need

3   not accept the opinion of any physician, including a treating physician, if that opinion is brief,

4   conclusory, and inadequately supported by clinical findings.'"  *Bray v. Comm'r of Social Security*

5   *Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th

6   Cir. 2002)).

7        When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ

8   must do two things.  First, the ALJ must consider other factors, including the length of the

9   treatment relationship and the frequency of examination, the nature and extent of the treatment

10  relationship, supportability, consistency with the record, and specialization of the physician.  20

11  C.F.R. § 416.927(c)(2)-(6); *see also Trevizo v. Berryhill*, 871 F.3d 664, 675 (9th Cir. 2017) (citing

12  20 C.F.R. § 404.1527(c)(2)-(6)).[10]  Consideration must also be given to other factors, whether

13  raised by the claimant or by others, or if known to the ALJ, including the amount of relevant

14  evidence supporting the opinion and the quality of the explanation provided; the degree of

15  understanding a physician has of the Commissioner's disability programs and their evidentiary

16  requirements; and the degree of his or her familiarity with other information in the case record.  20

17  C.F.R. § 416.927(c)(6); *Orn*, 495 F.3d at 631.  The failure to consider these factors, by itself,

18  constitutes reversible error.  *See Trevizo*, 871 F.3d at 676.

19       Second, the ALJ must provide reasons for rejecting or discounting the treating physician's

20  opinion.  The legal standard that applies to the ALJ's proffered reasons depends on whether or not

21  the treating physician's opinion is contradicted by another physician.  When a treating physician's

22  opinion is not contradicted by another physician, the ALJ must provide "clear and convincing"

23  reasons for rejecting or discounting the opinion, supported by substantial evidence.  *Id.* at 675.

24  When a treating physician's opinion is contradicted by another physician, an ALJ must provide

25  "specific and legitimate reasons" for rejecting or discounting the treating physician's opinion,

26

27  _____

28  [10] Although *Trevizo* concerned an application for disability insurance benefits under Title II of the
    Social Security Act, in discussing the proper assessment of medical opinions, the *Trevizo* court
    addressed regulations that parallel those applicable to SSI applications.

supported by substantial evidence. *Id.* "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quotations and citation omitted).

### 1.    Dr. Le's MIQ

Dr. Le concluded that Mr. Johnson was "unable to meet competitive standards" for nearly all mental abilities and aptitudes required for unskilled work; that he exhibited moderate or marked limitations in activities of daily living, social functioning, concentration, persistence or pace; and that he had experienced at least three episodes of decompensation, each of at least two weeks' duration. AR 317–19. Dr. Le also concluded that Mr. Johnson's mental impairments would cause him to be absent from work more than four days per month. AR 319.

The ALJ considered Dr. Le's MIQ at step four, but discounted it and assigned it only "some weight." AR 25. No other physician contradicted Dr. Le's opinion, so the ALJ was required to provide clear and convincing reasons for giving the opinion less than controlling weight. The ALJ cited two reasons for discounting Dr. Le's MIQ. First, he found that evidence in the record did not substantiate Dr. Le's opinion. Second, he found that Mr. Johnson's testimony did not support Dr. Le's findings of extreme limitations. The Court finds that these reasons are not supported by substantial evidence in the record and do not meet the clear and convincing standard.

While the ALJ need not give controlling weight to a treating physician opinion that is conclusory or inadequately supported, the ALJ does not criticize Dr. Le's opinion on these grounds. Rather, the ALJ asserts without explanation that "Dr. Le's extreme limitations are simply not substantiated by evidence in the record . . . ." AR 25. "[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion." *Garrison*, 759 F.3d at 1012–13 (internal citation omitted). The ALJ has not adequately explained how Dr. Le's opinion is inconsistent with other evidence in the record.

33

The ALJ also found Dr. Le's opinion inconsistent with Mr. Johnson's own testimony regarding his daily activities. AR 25. As discussed above, however, the ALJ has mischaracterized that testimony. But even if the Court accepted the ALJ's characterization, there is no support in the record for the ALJ's summary conclusion that these purported daily activities "demonstrate[] mental ability to perform simple, repetitive tasks" and "appropriate social functioning." *See id.*

Finally, the ALJ failed to discuss any of the factors listed in 20 C.F.R. § 416.927(c)(2)-(6), including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician. *See Trevizo*, 871 F.3d at 676.

For these reasons, the ALJ's decision to give Dr. Le's opinion less than controlling weight is not supported by clear and convincing reasons and substantial evidence.

### 2. Ms. Egbujor's opinion

The ALJ correctly concluded that Ms. Egbujor was an "other source." Under the operative regulations governing this appeal, nurse practitioners do not qualify as acceptable medical sources. 20 C.F.R. § 416.913(d)(1) (2016)[11]; SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *see Dale v. Colvin* 823 F.3d 941, 943 (9th Cir. 2016) (citing 20 C.F.R. § 404.1513(a) & (d)(1)).

Although "[t]he ALJ may discount testimony from these 'other sources' if the ALJ gives reasons germane to each witness for doing so," *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (discussing 20 C.F.R. § 404.1513(a)) (quotations and citation omitted), the ALJ failed to do so here. The record shows that Ms. Egbujor saw Mr. Johnson on September 23, 2015 and again on October 7, 2015. AR 325, 334. In his decision, the ALJ gave Ms. Egbujor's opinion that Mr. Johnson was unable to engage in basic work activities "very little weight" because her report relied on "patient history," and because the ALJ had identified "notable inconsistencies in the claimant's history . . . throughout this decision." AR 26. As discussed above, the ALJ's conclusion concerning Mr. Johnson's credibility contained numerous errors. Because his chief criticism of Ms. Egbujor's opinion was that it relied solely upon Mr. Johnson's "patient history,"

---

[11] 20 C.F.R. § 416.913 was amended effective March 27, 2017. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

those same flaws appear to have influenced the weight he gave to her opinion.

The Commissioner correctly observes that Ms. Egbujor's medical source statement dates to her first encounter with Mr. Johnson, before he received the benefit of any medication and professional counseling. Dkt. No. 23 at 11. However, the ALJ did not identify that fact as a reason for his rejection of Ms. Egbujor's opinion, and the Court may not rely on reasoning that the ALJ did not express. *Bray*, 554 F.3d at 1226.

The Court therefore finds that the ALJ failed to provide germane reasons based on substantial evidence for discounting Ms. Egbujor's opinion.

### 3. The neuropsychological report

The ALJ classified the neuropsychological report as "other source" medical information instead of a medical source statement, and gave it some weight insofar as it was based on clinical testing. AR 26. Mr. Johnson contends that the ALJ should have considered the report a medical source statement authored by at least Dr. Pinn, and should have given it controlling weight.

There is no dispute that Ms. DeVaughn was not a licensed psychologist, and therefore her opinion could not have been considered an acceptable medical source. 20 C.F.R. § 416.913(d)(1) (2016)[12]; SSR 06-03p, 2006 WL 2329939, at *1–2 (Aug. 9, 2006). However, the parties disagree about who authored the report interpreting and memorializing the tests, and whether the fact that Ms. DeVaughn was supervised by "three Ph.D.s" supports giving the report controlling weight.

The ALJ appears to have assumed without explicitly finding that Ms. DeVaughn was the author of the report. *See* AR 26 (referring to "Ms. DeVaughn's reports" and "Ms. DeVaughn's statement"). The report contains signature lines at the end for both Ms. DeVaughn and Dr. Pinn, but neither signature line was signed. AR 356. Ms. DeVaughn entered progress notes into Mr. Johnson's medical record on December 16, 2015, stating that she conducted the tests under the supervision of Dr. Preston. AR 332. However, Dr. Pinn entered her own progress notes on February 5, 2016, with the "Author" field stating "Jodi L. Pinn, PHD" and the "Note Status" field stating "Signed." AR 356.

---

[12] 20 C.F.R. § 416.913 was amended effective March 27, 2017. Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017).

1  The Commissioner argues that Dr. Preston's May 17, 2016 letter concerning errors in the

2  report "underscores the unreliable nature of Ms. DeVaughn's report, and his need to closely

3  supervise Ms. DeVaughn's work as a practicum student . . . ." Dkt. No. 23 at 12.  The

4  Commissioner's reliance on Dr. Preston's letter is unpersuasive.  None of the errors corrected by

5  Dr. Preston impacts Mr. Johnson's test results.  Although the misstatement that Mr. Johnson

6  suffers from schizoaffective disorder with manic symptoms as opposed to depressive symptoms

7  could be considered substantive, the other corrections are minor and non-substantive.  Moreover,

8  elsewhere, the report correctly notes that Mr. Johnson's DSM-V diagnosis is "Schizoaffective

9  Disorder, Depressive type, Unspecified 295.70 (F25.1)."  AR 361.  At any rate, the ALJ's decision

10  does not mention these corrections, and the Commissioner's attempt to use them now as support

11  for the ALJ's opinion is impermissible.  *Bray*, 554 F.3d at 1226 ("Long-standing principles of

12  administrative law require us to review the ALJ's decision based on the reasoning and factual

13  findings offered by the ALJ—not *post hoc* rationalizations that attempt to intuit what the

14  adjudicator may have been thinking.").

15  The Commissioner notes that even if the report were actually authored by one of the

16  supervising doctors, they were examining physicians, and therefore their opinion would not have

17  been entitled to controlling weight.  Dkt. No. 23 at 13 (citing 20 C.F.R. §§ 416.902,

18  416.927(c)(2)).  This point is well taken, and Mr. Johnson does not dispute it.

19  The ALJ's decision to give the report "some weight" as "other source" medical evidence is

20  supported by evidence in the record, even if that evidence is susceptible to more than one rational

21  interpretation.  The Court therefore affirms the ALJ's decision to give some weight to the

22  neuropsychological report.

23  Because there is not substantial evidence to support the ALJ's decision to discount Dr.

24  Le's and Ms. Egbujor's opinions, Mr. Johnson's motion for summary judgment is granted on this

25  point.  However, because there was substantial evidence to support giving only some weight to the

26  neuropsychological report, the Commissioner's cross-motion is granted with respect to that issue.

27  As the ALJ's errors with respect to Dr. Le and Ms. Egbujor are not harmless, the Court must

28  remand for appropriate reconsideration of their opinions.  *Brown-Hunter v. Colvin*, 806 F.3d 487,

492 (9th Cir. 2015) (as amended); *see also Burch*, 400 F.3d at 679.. In particular, if the ALJ finds on remand that Dr. Le's opinion deserves less than controlling weight, he must articulate legally sufficient reasons for doing so and must state what, if any, weight he affords that opinion.

### C. The ALJ's Step Three Analysis

Mr. Johnson argues that the ALJ's determination that his impairments did not meet or equal a listed impairment was erroneous because the ALJ failed to consider and properly weigh Dr. Le's MIQ and the neuropsychological report. As discussed, the Commissioner maintains that the ALJ properly discounted those opinions.

In conducting his step three special technique analysis, the ALJ considered three Listings: 12.03 (Schizophrenic, Paranoid and Other Psychotic Disorders), 12.04 (Affective Disorders) and 12.06 (Anxiety and Obsessive-Compulsive Disorders). AR 21–22. At the time the ALJ rendered his decision in September 2016, each of these listings was satisfied by meeting the requirements of both paragraphs A and B, or paragraph C alone.[13] Listings 12.03 and 12.04 had the same requirements for both paragraphs B and C:

> B. Resulting in at least two of the following:
>
> > 1. Marked restriction of activities of daily living; or
> >
> > 2. Marked difficulties in maintaining social functioning; or
> >
> > 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> >
> > 4. Repeated episodes of decompensation, each of extended duration;
>
> OR
>
> C. Medically documented history of a chronic [relevant mental] disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

---

[13] Mr. Johnson's summary judgment motion attempts to apply the current version of the listing of impairments, which were revised in 2017 after the ALJ issued his decision. *See* Dkt. No. 22 at 9.

United States District Court
Northern District of California

> 1. Repeated episodes of decompensation, each of extended
> duration; or
>
> 2. A residual disease process that has resulted in such
> marginal adjustment that even a minimal increase in mental
> demands or change in the environment would be predicted to
> cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function
> outside a highly supportive living arrangement, with an
> indication of continued need for such an arrangement.

20 C.F.R. pt. 404, Subpt. P., App. 1, §§ 12.03, 12.04 (2016). Mr. Johnson does not appeal the

ALJ's determination with respect to Listing 12.06, and the Court therefore addresses only Listings

12.03 and 12.04.

### 1.      Paragraph A

Paragraph A requires "medically documented persistence" or "medically documented

findings" of specific symptoms, signs, or laboratory findings. 20 C.F.R. pt. 404, Subpt. P., App. 1,

§§ 12.03, 12.04 (2016). The ALJ apparently assumed the existence of the paragraph A criteria for

all three listings, as he did not discuss whether the paragraph A criteria were met. *See* AR 21–22.

Instead, the ALJ's analysis focused almost exclusively on whether the paragraph B and C criteria

had been satisfied for the listings at issue.

Neither Mr. Johnson nor the Commissioner dispute the ALJ's assumption that the

paragraph A requirements were satisfied for both Listings 12.03 and 12.04. However, if the ALJ's

failure to discuss whether Mr. Johnson satisfied the applicable paragraph A requirements was

error, it was harmless, because it was inconsequential to his ultimate nondisability determination.

*Tommasetti v. Astrue*, 533. F.3d 1035, 1038 (9th Cir. 2008).

### 2.      Paragraph B

Mr. Johnson argues that the ALJ's determination that he did not satisfy the paragraph B

requirements was error, focusing on the ALJ's failure to consider Dr. Le's MIQ, Ms. Egbujor's

opinion, and the neuropsychological report in the paragraph B analysis. The Commissioner

responds that the ALJ properly rejected those pieces of evidence and found that Mr. Johnson did

not meet the listings.

### a.     Activities of daily living

The ALJ's paragraph B analysis relied primarily on medical progress notes from examining physicians (Exhibit 5F) and Mr. Johnson's testimony at the hearing.  In finding that Mr. Johnson's impairments only pose a mild restriction on his activities of daily living, the ALJ noted that Mr. Johnson's testimony that he walks to Starbucks for coffee and then visits the library, sometimes using public transportation and sometimes riding his bike, suggests no restrictions, but the fact that Mr. Johnson is homeless and his doctors observed that his grooming and hygiene appeared "marginal" led the ALJ to conclude that Mr. Johnson is only mildly restricted in daily living.  AR 21.  As discussed above, the ALJ mischaracterized Mr. Johnson's testimony regarding his daily activities and limitations, and therefore his reliance on that mischaracterization in the paragraph B analysis resulted in error.  Moreover, the ALJ altogether failed to address Dr. Le's MIQ observing that Mr. Johnson exhibited moderate restrictions in the activities of daily living, which likewise constituted error.  AR 319.

### b.     Social functioning

The ALJ determined that Mr. Johnson had moderate difficulties with social functioning. Although the ALJ acknowledged conflicting medical reports about the severity of Mr. Johnson's social functioning, he noted that Mr. Johnson "testified that he maintains gym membership at '24 Hour Fitness' where he exercises and speaks to others while using the sauna."  AR 21.  Based on the medical reports and Mr. Johnson's visits to the gym, the ALJ determined that a finding of "moderate" limitation "more than adequately accounts for impairment related limitation in this area of functioning."  *Id.* (emphasis original).  However, as discussed above, the ALJ mischaracterized Mr. Johnson's testimony regarding his visits to and socialization at the gym, and therefore his reliance on that mischaracterization in the paragraph B analysis resulted in error. Moreover, the ALJ altogether failed to consider Dr. Le's conclusion that Mr. Johnson exhibited marked difficulties in maintaining social functioning, which likewise was error.  AR 319.

### c.     Concentration, persistence, and pace

The ALJ's determination concerning Mr. Johnson's concentration, persistence, and pace similarly relied on the ALJ's improper evaluation of Mr. Johnson's credibility and,

correspondingly, Ms. Egbujor's opinion.  The ALJ stated that Mr. Johnson's "ability to exercise

daily, is additional evidence of ability to concentrate."  AR 22.  As discussed above, Mr.

Johnson's testimony revealed that his primary purpose in going to the gym was to shower, not to

exercise, and when he sat on an exercise bike, he did so only for 10 minutes at a time.  AR 52–53,

54, 66.  That testimony is not substantial evidence in support of Mr. Johnson's ability to

concentrate, persist, or maintain pace in a workplace environment.

The ALJ also failed to consider Ms. Egbujor's opinion in his paragraph B analysis

altogether.  Although she opined that Mr. Johnson exhibited significant deficiencies of

concentration, persistence, or pace, the ALJ assigned her opinion very little weight solely because

her opinion was based on Mr. Johnson's reports to her, and the ALJ found Mr. Johnson's own

testimony to be less than credible.  AR 22, 26.  The ALJ's mischaracterization and discrediting of

Mr. Johnson's testimony (including his testimony about exercise) and subsequent discounting and

complete omission of Ms. Egbujor's opinion concerning concentration, persistence, or pace in the

paragraph B analysis was error.  Moreover, the ALJ altogether failed to address Dr. Le's MIQ

observing that Mr. Johnson exhibited marked difficulties in maintaining concentration,

persistence, or pace, which likewise was error.  AR 319.

### d.    Episodes of decompensation

Finally, the ALJ's analysis regarding decompensation consisted of a single sentence:

"Evidence in the record does <u>not</u> support any episodes of decompensation <u>of extended duration</u> as

defined by code."  AR 22 (emphasis original).  However, the ALJ's opinion failed to discuss Dr.

Le's MIQ, which directly contradicts the ALJ's summary conclusion regarding episodes of

decompensation: Dr. Le noted that Mr. Johnson had experienced three or more episodes of

decompensation within 12 months, each at least two weeks long.  AR 319.  The ALJ did not take

this evidence into consideration and did not explain why he did not do so in the paragraph B

analysis.  AR 19.  As discussed above, the ALJ improperly discounted the MIQ at step four as

contradicted by Mr. Johnson's testimony about going to Starbucks, the library, and the gym.

Because the ALJ mischaracterized and discredited Mr. Johnson's testimony, his discounting of Dr.

Le's MIQ was erroneous, and the ALJ's failure to consider the MIQ at step three was likewise

erroneous.

### 3. Paragraph C

In a short paragraph following the paragraph B analysis, the ALJ summarily confirmed that he had "also considered whether the 'paragraph C' criteria are satisfied" and concluded that the evidence in the record failed "to establish the presence of the 'paragraph C' criteria." AR 22. Again, the ALJ asserted that Mr. Johnson did not experience any repeated episodes of decompensation. For the reasons discussed above, the ALJ's failure to account altogether for Dr. Le's finding of three or more episodes of decompensation of extended duration as noted in the MIQ in the paragraph C analysis was error.

The Court finds that the ALJ's findings at step three are not supported by substantial evidence, and his omission of any reference to Dr. Le's or Ms. Egbujor's opinions with respect to the degree of functional limitation at step three of the analysis constitutes legal error. *See* 20 C.F.R. § 416.920a(e)(4) ("[T]he written decision must incorporate the pertinent findings and conclusions based on the technique" and it "must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s).").

The Court therefore grants Mr. Johnson's motion for summary judgment and denies the Commissioner's cross-motion on this issue, and remands for reconsideration of step three consistent with this order.

### D. The ALJ's Evaluation of the Vocational Expert's Testimony

Mr. Johnson argues that the ALJ erred by relying on Mr. Ferra's response to a hypothetical that did not account for all his limitations. This argument essentially restates Mr. Johnson's argument that the ALJ improperly discounted Mr. Johnson's testimony, Dr. Le's and Ms. Egbujor's opinions, and the neuropsychological report.

An ALJ posing a hypothetical question to a vocational expert "must include 'all of the claimant's functional limitations, both physical and mental' supported by the record." *Thomas*, 278 F.3d at 956 (quoting *Flores v. Shalala*, 49 F.3d 562, 570–71 (9th Cir. 1995)); *see also Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009); *Magallanes*, 881

F.2d at 756.  The ALJ did account for some of his mental impairments by including in his hypothetical the limitations of performing simple repetitive tasks and only occasional interactions with coworkers and the public.  AR 76.  However, as discussed above, the Court finds that the ALJ did not properly credit Mr. Johnson's testimony about his daily activities and limitations, or provide legally sufficient reasons for discounting Dr. Le's and Ms. Egbujor's statements in developing the RFC.  An ALJ "need not include all claimed impairments in his hypotheticals, [but] he must make specific findings explaining his rationale for disbelieving any of the claimant's subjective complaints not included in the hypothetical." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997).  In light of Mr. Ferra's response to the hypothetical that included Dr. Le's MIQ, the ALJ erred in concluding that Mr. Johnson could perform other jobs that existed in substantial numbers in the national economy. *Lewis v. Apfel*, 236 F.3d 503, 517–18 (9th Cir. 2001) (finding improper the ALJ's reliance on the VE's response to a hypothetical question that did not include all of claimant's impairments, even though another hypothetical question the ALJ asked had accounted for all of claimant's impairments).

The Court therefore grants Mr. Johnson's motion for summary judgment and denies the Commissioner's cross-motion on this issue, and remands for reconsideration of Mr. Ferra's testimony.

### E.  The ALJ's Development of the Record

Mr. Johnson contends that the ALJ failed to adequately develop the record, arguing that because the ALJ discounted the neuropsychological report because it was authored by a student, he should have scheduled another psychological evaluation with someone whose credentials the ALJ would have accepted.

"The ALJ is responsible for studying the record and resolving any conflicts or ambiguities in it." *Diedrich v. Berryhill*, 874 F.3d 634, 638 (9th Cir. 2017).  In a social security case, an ALJ is obligated to fully and fairly develop the record even if the claimant is represented by counsel. *Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003).  There is a heightened duty where the claimant is suffering from a mental condition, because claimants with mental impairments may not be able to protect themselves from loss of benefits by producing evidence. *DeLorme v.*

42

*Sullivan,* 924 F.2d 841, 849 (9th Cir. 1991). An ALJ's duty to develop the record "is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001). This duty may require the ALJ to obtain additional information by, *inter alia,* contacting treating physicians, scheduling consultative examinations, or calling a medical expert. 20 C.F.R. §§ 416.912(b), 416.913a.

Mr. Johnson admits that when the ALJ asked his counsel at the hearing about the possibility of a further psychiatric consultative exam, his counsel declined on the basis that he had already gone through "quite extensive psychiatric examination and assessment" and that the neuropsychological report was "pretty extensive." Dkt. No. 22 at 18; AR 64. The ALJ also held the record open for Mr. Johnson to submit additional evidence for 10 days after the hearing, but it does not appear that Mr. Johnson did so. AR 50, 80. Mr. Johnson does not argue that the evidence is ambiguous. The question is whether the record is inadequate to allow for a proper evaluation of the evidence. If, on remand and following proper consideration of the medical evidence of record, the ALJ concludes there is no evidence that he feels warrants more than "some" weight, he may wish to obtain additional information from a consultative examiner. *See Mayes*, 276 F.3d 459–60.

## V.     DISPOSITION

"When the ALJ denies benefits and the court finds error, the court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017) (citing *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014)). That is because "an ALJ's failure to provide sufficiently specific reasons for rejecting the testimony of a claimant or other witness does not, without more, require the reviewing court to credit the testimony as true." *Treichler*, 775 F.3d at 1106.

The Court may order an immediate award of benefits only if three conditions are met. First, the Court asks "whether the 'ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'" *Id.* (quoting *Garrison*, 759 F.3d at 1020). Next, the Court "determine[s] 'whether there are outstanding issues that must be resolved

before a determination of disability can be made . . . and whether further administrative proceedings would be useful.'" *Id.* (quoting *Treichler*, 775 F.3d at 1101).  "When these first two conditions are satisfied, [the Court] then credit[s] the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability." *Id.* (citing *Treichler*, 775 F.3d at 1101).  Even when all three conditions are satisfied and the evidence in question is credited as true, it is within the district court's discretion whether to make a direct award of benefits or to remand for further proceedings when the record as a whole creates serious doubt as to disability.  *Id.* at 1045.  As explained by the Ninth Circuit, "[a]n automatic award of benefits in a disability benefits case is a rare and prophylactic exception to the well-established ordinary remand rule." *Id.* at 1044.

In the present case, the first condition is met because the Court has found that the ALJ failed to provide legally sufficient reasons for giving only some weight to Dr. Le's opinion and for discounting Mr. Johnson's statements as to his symptoms and functional limitations.  However, there are outstanding issues that must be resolved before a final determination can be made.  The ALJ must reassess Mr. Johnson's statements and those of Dr. Le and provide legally adequate reasons for any portion of those opinions or statements that the ALJ discounts or rejects.  The ALJ must also explain the weight, if any, he gives to Ms. Egbujor's opinion.

## VI.    CONCLUSION

Based on the foregoing, Mr. Johnson's motion for summary judgment is granted in part and denied in part, the Commissioner's cross-motion for summary judgment is granted in part and denied in part, and this matter is remanded for further proceedings consistent with this order.  The Clerk of the Court shall enter judgment accordingly and close this file.

**IT IS SO ORDERED.**

Dated: March 31, 2019

VIRGINIA K. DEMARCHI
United States Magistrate Judge